GILMAR PEREIRA DA SILVA JR. | BOP 74744-511 | PERSONAL STATEMENT TO THE COURT

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA
v.
GILMAR PEREIRA DA SILVA JR.

Case No. 8:25-cr-144-KKM-SPF

OCT 14 2026 PM12:34
FILED - USDC - FLMD - TPA

Hon. Kathryn Kimball Mizelle

DEFENDANT'S PERSONAL FACTUAL STATEMENT CONCERNING CONDITIONS AT FCC COLEMAN LOW, CONTINUING MEDICAL/DENTAL DETERIORATION, AND EFFORTS TO OBTAIN HELP

October 7, 2026

1. PURPOSE AND FILING POSTURE

Your Honor:

My name is Gilmar Pereira da Silva Junior, BOP Register No. 74744-511. I am confined at FCC Coleman Low in Florida in connection with United States v. Gilmar Pereira da Silva Jr., Case No. 8:25-cr-144-KKM-SPF. I respectfully submit this personal factual statement so that the Court can understand what has happened to me since I entered FCC Coleman Low on May 4, 2026, what I have done to obtain help, what remains unresolved, and why my health and my ability to navigate the institutional process have become inseparable from the AO 250 compassionate-release filing I am preparing.

I am not sending this as a private communication to Chambers and I am not asking the Court to act on an off-the-record request. I intend this statement to be submitted through the Clerk for filing in my criminal case, with service as required, so that what I say is part of the record. I am also not asking this letter, standing alone, to substitute for my AO 250 motion. I am asking that my circumstances be understood as a continuous chronology rather than as isolated forms, dental visits, grievances, or administrative events.

2. WHAT I BROUGHT WITH ME INTO CUSTODY

Before entering federal custody, I had suffered a serious motorcycle accident and undergone mandibular reconstruction with titanium hardware. I was in therapeutic orthodontic treatment connected to that reconstructed jaw and to the condition of my teeth. This was not, and is not, a cosmetic preference. When FCC Coleman Low examined me on May 15, 2026, its own BP-A0618 A&O Dental Examination recorded: "ORTHO TREATMENT IN PROGRESS." That institutional record is important because it confirms that the orthodontic treatment existed when I entered custody and was part of my clinical history.

3. ARRIVAL AT FCC COLEMAN LOW AND PLACEMENT IN THE SHU

I entered FCC Coleman Low on May 4, 2026. Almost immediately after my arrival, I was placed in the Special Housing Unit (SHU). I remained there for approximately eight days, approximately May 4 through May 12, with my records and prior submissions identifying cells 130 and 129.

I affirm to the Court that I was placed in the SHU. This was the beginning of the deterioration I have been trying to explain ever since. During that period I experienced severe difficulty maintaining basic oral hygiene and caring for the therapeutic appliance. I did not have the normal access I needed to a toothbrush and to ordinary hygiene and appliance maintenance. I experienced psychological pressure, humiliation, fear, uncertainty, and difficulty obtaining the medical and dental assistance I was asking for. I have repeatedly requested preservation and review of the housing, movement, SHU, welfare-check, medical, psychology,

---

camera and other institutional records that can independently document that period.

On May 6, while I was in this early custody period, the orthodontic appliance/wire was damaged or broke. On May 7 I experienced and reported tooth loss. The loss did not end with one tooth. I later reported the loss of approximately four teeth and my fear that additional teeth would be lost. These events occurred against the background of a surgically reconstructed mandible containing titanium hardware and an active therapeutic orthodontic treatment that had been interrupted..

4. THE FIRST INSTITUTIONAL DOCUMENTATION AND THE FAILURE TO CREATE CONTINUITY OF CARE

On May 15, 2026, the BOP dental intake record documented "ORTHO TREATMENT IN PROGRESS." I needed that finding to lead to continuity of care appropriate to a reconstructed jaw, damaged appliance, and emerging tooth loss. Instead, the months that followed became a cycle of requests, directions to other departments, repeated explanations, and no durable specialized treatment pathway.

After leaving the SHU, I continued trying to obtain help. Approximately one week after the SHU period, I sought medical assistance after the tooth loss. I explained that the problem was not simply discomfort from braces. I had a reconstructed mandible, titanium hardware, a damaged therapeutic appliance, tooth loss, and concern about the stability of my remaining teeth and jaw.

5. JUNE AND JULY: DENTAL LOW, SICK CALL, AND THE UNRESOLVED SPECIALIST PROBLEM

On June 2, 2026, I submitted an urgent written request to Dental Low. I described the motorcycle accident, mandibular reconstruction, titanium hardware, orthodontic treatment, damaged appliance and need for specialized evaluation. The institutional response eventually made clear that orthodontic treatment was not provided locally and directed me to Dental Sick Call.

I followed that instruction. On July 21, 2026, I went through Dental Complaint/Sick Call and again explained that my appliance required attention, that I was losing teeth, and that without adequate care I feared further loss. By then I was reporting three or four lost teeth. The central question I kept asking was straightforward: if FCC Coleman Low did not provide the specialized orthodontic/maxillofacial care required by my condition, what official mechanism would obtain a qualified specialist evaluation, Utilization Review, Specialty Services review, Regional Chief Dentist involvement, outside care, or another clinically appropriate solution?

On July 30, a BP-S358.060 record contained the words "PATIENT REFUSED TO SIGN." I did not sign that document. I have consistently disputed any attempt to transform a refusal to sign a document, or any disagreement concerning a particular encounter, into a blanket assertion that I refused dental treatment. I was asking for treatment. I continued asking for treatment afterward. I received antiseptic mouthwash, and I understood from the encounter that treatment beyond the institution's capabilities would need to occur outside. I repeatedly asked the institution to identify precisely what treatment it contends I refused, who recorded the alleged refusal, and how that notation could coexist with my continuous requests for care.

6. AUGUST: REPEATED REQUESTS ACROSS DEPARTMENTS AND THE AUGUST 24 DENTAL ENCOUNTER

By August, I was no longer relying on one department or one method. I sought assistance through Dental, Medical/Health Services, Psychology, Food Services, Commissary, Unit Staff, the Warden, TRULINCS, in-person contacts, COP-OUTs and the Administrative Remedy Program. I requested my medical and dental records and identified missing or incomplete material that I believed was necessary to understand what had been done, including information concerning the panoramic X-ray and treatment decisions.

On August 7 I sent new requests concerning my dental condition, eating and chewing difficulty, and the psychological effect of living with an unresolved and worsening problem. On August 10 I continued seeking records. On August 13 I attempted to obtain assistance in person. On August 16 I sent what I expressly identified as my Fourth Formal and Urgent Request to the Warden. That request did not merely complain. It asked for concrete answers: the status and deadlines of my administrative remedies; the status of my broken appliance, lost teeth and panoramic imaging; a specialist referral and Utilization Review; access to records; preservation of evidence; protection against retaliation; and formal consideration of Reduction in Sentence/Compassionate Release.

I also pursued Administrative Remedies, including Remedy Nos. 1287596-F1 and 1289925-F1. On August 17 I received back the BP-9 associated with Remedy 1287596-F1. I continued trying to correct procedural problems rather than abandon the process. On August 18 I requested individualized review, a definitive treatment plan, specialty referral, immediate action and

preservation of evidence. On August 22 I again asked for clarification of the alleged refusal of treatment and for a Specialty Referral/Dental Utilization Review pathway.

On August 24 I returned to Dental Sick Call. I arrived at approximately 6:35 a.m. and was seen at approximately 8:30 a.m. I brought a written form explaining the damaged appliance, tooth loss and difficulty eating. The form was returned to me. Dr.. Gina Torres-Marin viewed or opened my PANOREX. I left that process without the specialized treatment plan I had been seeking. The institutional narrative that I had "refused" treatment remained an obstacle even though I was physically present at Sick Call asking for help.

7. MY PRESENT PHYSICAL CONDITION IS NOT A PAPERWORK DISPUTE

The consequences are physical and continuous. The orthodontic appliance remains damaged/broken, and exposed metal has been cutting the inside of my mouth. I have jaw pain in the context of prior mandibular reconstruction and titanium hardware. I have already lost multiple teeth after entering FCC Coleman Low. I fear further loss and irreversible deterioration of the teeth that remain. I have difficulty chewing and eating comfortably. I have experienced severe oral discomfort and severe bad breath that is distressing and embarrassing and that requires clinical evaluation rather than assumptions about its cause. I fear infection or additional damage. Pain, oral injury, uncertainty and fear have interfered with eating and sleep.

I do not claim to diagnose myself. I am asking for qualified evaluation. What I can state from direct experience is that I am living with the pain, the damaged metal, the missing teeth, the chewing difficulty, the sleep disruption and the fear every day, while the specialized problem that I began reporting months ago remains unresolved.

8. THE UNIT TEAM AND THE RIS/COMPASSIONATE RELEASE PROCESS

The same pattern of redirection and uncertainty occurred when I tried to pursue Reduction in Sentence/Compassionate Release.

On August 16, in my Fourth Formal and Urgent Request to the Warden, I expressly asked that the compassionate-release portion be treated as a formal request and asked for formal receipt, the exact date of receipt, processing, medical and dental evaluation, specialist-care analysis, consideration of whether my circumstances constituted extraordinary and compelling reasons, and a written response.

On August 28, 2026, at approximately 3:00 p.m., I personally delivered my formal RIS/Compassionate Release materials at the Warden's office. Captain S. Ximenes received and reviewed the materials and indicated that they would be forwarded to the Warden.

On August 31, at approximately 8:00 a.m., I received through another inmate an A4 sheet titled "INMATE REQUEST TO STAFF MEMBER RESPONSE." It did not provide a clearly identifiable signed decision by the Warden. I was informed that it came from Case Manager T. Chin and that I should proceed through the Unit Team/Case Manager. At approximately 10:00 a.m. I spoke with Ms. Chin. I was told that I had to submit a COP-OUT before speaking with her and that a COP-OUT through TRULINCS would not be accepted or validated for that purpose.

I followed those instructions. On September 2, 2026, I delivered a BP-A0148/Inmate Request to Staff to Case Manager T. Chin. I stated that I was following the instructions provided on August 31 and requested the appropriate RIS/Compassionate Release form and processing through my Unit Team.

I then waited. The COP-OUT was not returned to me until September 30, 2026. When it was returned, it did not contain a substantive disposition, signature, date or written resolution telling me that the RIS request had been decided. When I sought the date on which the Warden had received my RIS application, I was not given that date. I was left trying to establish the status of a process in which the date of Warden receipt is legally significant, while the institution itself controlled the records of receipt and routing.

---

On September 30 I therefore prepared a formal demand for a written, point-by-point explanation of how the institution and BOP considered their procedures satisfied: what rule authorized a BP-A0148 to remain without disposition, signature and date; where the official record of the August 28 receipt was; who received, copied, routed or filed my exhibits; what policy was applied to my September 2 COP-OUT; why there was no written disposition if a verbal response supposedly existed; and who could review the conduct if the complaint itself involved the Unit Team.

This is why the Unit Team issue is so important to me. I did what I was instructed to do. I went where I was directed. I submitted the paper I was told to submit. I waited. I asked for dates and documentation. Instead of obtaining a clear decision and a reliable paper trail, I remained uncertain about who was responsible for processing the request and what had actually been done with it.

9. ADMINISTRATIVE BARRIERS WHILE TRYING TO PROTECT MY HEALTH AND LEGAL RIGHTS

My ability to document and pursue these matters has also been affected by practical institutional barriers. My legal and administrative file grew to more than approximately 800 pages. I encountered shortages or lack of Copy Cards, unpredictable access to copying, lockdowns, unclear Unit Team access, outdated notice-board information, envelope and mailing constraints, and difficulty obtaining the copies needed for administrative appeals and legal submissions. These obstacles mattered because every stage required me to preserve dates, copies, forms and proof while I was simultaneously dealing with pain, difficulty eating, disturbed sleep and fear about my health.

I repeatedly requested preservation of relevant records, including SHU and housing records, movement records, medical and dental records, PANOREX/imaging, EMR entries, treatment plans, referrals, Utilization Review records, Specialty Services records, records concerning the alleged refusal of treatment, TRULINCS messages, Administrative Remedy records, Unit Team and Warden records, mail records and any relevant video or other evidence. I have been trying to prevent the history from becoming a dispute about memory after records disappear.

10.. EFFORTS TO OBTAIN HELP OUTSIDE FCC COLEMAN LOW

I did not limit my requests for help to the people inside FCC Coleman Low. When the internal process failed to produce a durable solution, I sought assistance through outside federal oversight and legal channels.

I sought assistance from the U.S. Office of Special Counsel during the period associated with Special Counsel Hampton Dellinger or the successor/acting leadership, asking for federal oversight and intervention concerning what was happening at FCC Coleman Low. When no meaningful solution reached me, I later escalated the matter again to Special Counsel Charles N. Baldis, asking for immediate review, protective action, written acknowledgment and response, preservation of evidence, and referral to any federal authority with jurisdiction if OSC itself could not provide the needed relief.

I also prepared and pursued requests for independent review through Department of Justice oversight channels, including the DOJ Office of the Inspector General, asking for review of the continuing medical/dental deterioration, record handling, institutional processes and failures to produce a definitive specialized-care pathway. My materials also reflect efforts directed toward CIGIE-related oversight channels.

I sought legal assistance through federal defense channels, including Assistant Federal Public Defender Ryan J. Maguire and the Office of the Federal Defender for the Middle District of Florida. A September 2 communication connected with Federal Defender counsel was identified in my materials as recommending consideration of a medical furlough. I explored medical furlough and escorted medical treatment because my objective was not to create conflict; it was to reach appropriate care safely.

These outside efforts are important not because every office had authority to grant every form of relief, but because they show the extent to which I have tried to find someone who could take responsibility for the unresolved problem. Some institutional contacts did respond to individual requests for example, Dental told me orthodontic treatment was not provided locally, and administrative papers were returned but those responses did not produce the specialist care or durable resolution I was seeking. For several outside requests, I have not received a substantive response that solved the problem. I do not want to state that an office never responded where the complete transmission and response record is not presently in my possession; I

---

state instead what I know directly: no outside effort has resulted in the specialized treatment, protection, or final resolution I still need.

11. FEAR OF RETALIATION AND TRANSFER

Because I have repeatedly complained, filed remedies, asked for preservation of evidence, sought outside oversight and pursued compassionate release, I have repeatedly asked for protection against retaliation. I do not want to be transferred merely because I complained or because moving me would move the problem somewhere else.. I have asked for written protection against retaliation and for assurance that I will not be transferred as a retaliatory response. If a transfer were genuinely medically necessary to obtain qualified treatment, that would be a different question; what I fear is punitive or retaliatory movement rather than a clinically arranged solution.

Living with that fear adds to the physical problem. I do not know from one day to the next whether asking again for help will improve my situation, be ignored, create another procedural loop, or expose me to consequences. That uncertainty has become part of my daily life.

12. WHY I AM ASKING THE COURT TO UNDERSTAND THIS NOW

I am preparing the AO 250 because the institutional process has not produced the solution my health requires and because more than thirty days have elapsed since the August 28 delivery of my formal RIS/Compassionate Release request to the Warden's office. I understand that the Court will decide any motion on the law and the evidence. I am not asking for a decision based on emotion alone.

I am asking the Court to understand the human and factual sequence behind the documents. I entered FCC Coleman Low on May 4 with a reconstructed jaw and therapeutic orthodontic treatment. I was placed in the SHU almost immediately. The appliance was damaged. I began losing teeth. The BOP documented "ORTHO TREATMENT IN PROGRESS." I asked Dental for help. I followed the direction to Sick Call. I challenged an inaccurate implication that I refused care. I asked Medical, Health Services, Psychology, Food Services, Unit Staff and the Warden. I used TRULINCS, COP-OUTs and Administrative Remedies. I asked for my records. I asked for specialist review. I asked for Utilization Review. I asked for preservation of evidence. I asked for protection. I asked for compassionate-release processing. I followed the Unit Team's directions. I sought help outside the institution. Yet I remain here with the underlying specialized problem unresolved and with continuing pain, oral injury, missing teeth, chewing difficulty, disturbed sleep and fear of further deterioration.

The most difficult part is the accumulation. Any single form can be made to look small. Any single dental visit can be described as an encounter. Any single grievance can be returned or redirected. But I have been living the entire sequence without interruption since May. The physical problem and the administrative problem have reinforced each other: while I try to obtain care, I must also prove that I asked for care; while I try to preserve proof, I must navigate copying and access barriers; while I pursue a lawful release mechanism, I must determine what happened to the request from the same institution that controls the routing records.

13. MY REQUEST TO THE COURT

I respectfully ask that this statement be placed in the record and read together with the AO 250 motion and supporting exhibits when filed. I ask the Court to consider the full chronology, including the SHU period, the preexisting reconstructed jaw, the documented ongoing orthodontic treatment, the appliance damage, tooth loss, current oral injuries and functional problems, the repeated institutional requests, the administrative-remedy history, the Unit Team/RIS processing events, the barriers to documenting the case, and the outside attempts to obtain help.

I ask that my statements about what I personally experienced be understood as my direct declaration of those events. Where FCC Coleman Low or the BOP controls the confirming records, I ask that those records be preserved and, if necessary, obtained and reviewed rather than allowing the absence of records in my personal possession to be used against me.

I am exhausted by the process, but I am continuing because I am afraid of what will happen to my mouth, teeth, reconstructed jaw and overall health if the condition continues without appropriate specialized care. I am not eating and sleeping normally. I live with pain, injury, uncertainty and fear. I have tried repeatedly to solve the problem through the institution and through outside channels. I do not know another person or office to whom I can meaningfully turn for a final solution.

I respectfully ask the Court to see the entire record not as isolated complaints, but as one continuous course of events that began when I entered FCC Coleman Low and continues today.

---

14. DECLARATION

I declare under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge and recollection.

Executed on: OCTOBER 7, 2026

Gilmar Pereira da Silva Junior
BOP Register No. 74744-511
FCC Coleman Low
Unit COL-B-D / B4

Case No. 8:25-cr-144-KKM-SPF | Filed through the Clerk - not ex parte correspondence