---

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA TAMPA DIVISION
UNITED STATES OF AMERICA v. GILMAR PEREIRA DA SILVA JUNIOR
Case No. 8:25-cr-144-KKM-SPF | BOP Register No. 74744-511

PRO SE SUPPLEMENTAL MEMORANDUM CONCERNING WARDEN AND ACTING WARDEN SUPERVISORY OMISSIONS, EMERGENCY ADMINISTRATIVE REMEDY PROCESSING, CONTINUING HARM TO HEALTH, AND REQUEST FOR IMMEDIATE CORRECTIVE ACTION

Submission for consideration as a possible supplement to AO 250 and, upon separate delivery, as formal notice to responsible institutional officials

I. SPECIFIC PURPOSE AND SCOPE OF THIS SUBMISSION

I, Gilmar Pereira da Silva Junior, a federal prisoner currently confined at FCC Coleman Low and proceeding pro se, submit this document to place on record and request examination of the institution's leadership and supervisory omissions in response to repeated requests expressly identified as urgent. Its specific purpose is not to repeat the entire clinical history already set out in my AO 250 and earlier memoranda, but to demonstrate how institutional management, including the Warden and Acting Warden, received successive warnings of threats to my health and welfare yet, to date, has not provided an effective clinical resolution, a sufficiently reasoned decision, or a verifiable protective plan.

This submission serves three distinct legal purposes: to provide the Court with information relevant to the severity and persistence of the medical situation already presented in my case; to formally notify institutional officials of continuing harm and demand documented corrective action; and to preserve an organized record of communications, omissions, decisions, and evidence for any legally appropriate avenue of relief. I do not confuse the criminal court's authority to decide a sentence reduction with the Warden's administrative duties, nor do I suggest that filing this document alone commences an independent civil action.

My position is unequivocal: I affirm that I have remained in custody with a progressive dental and mandibular problem, have repeatedly sought assistance, and still lack an effective resolution. A finding of individual constitutional liability requires examination of the governing legal elements and each official's records. Accordingly, I demand preservation and review of institutional documentation against my communications, rather than an assumption that issuing an administrative response necessarily constituted adequate medical care.

II. IDENTIFICATION OF OFFICIALS AND FUNCTIONAL RESPONSIBILITY

My requests were directed, among others, to the Warden identified in my correspondence as Mr. A. Mendoza and the Acting Warden identified as Mrs. C. C. Rhodes. I identify them to establish the decision-making chain: which communications each official received, when they were received, what responsibilities each official exercised at the relevant time, and what measures were ordered. Acting status does not extinguish institutional obligations to process requests and protect prisoners, but neither does a leadership position automatically establish personal liability for every subordinate's action.

I request that the BOP identify each official's dates of service, the responsible Administrative Remedy Coordinator, personnel who routed messages and COP-OUTs, medical professionals consulted, records of actual notice to management, and the official who decided to accept, reject, classify, or decline to classify my requests as emergencies. A serious inquiry cannot end with the generic assertion that the matter was forwarded to Dental Low; it must identify when, to whom, with what information, under what deadline, and with what result.

III. MEDICAL CONDITION BROUGHT TO MANAGEMENT'S ATTENTION

I voluntarily entered FCC Coleman Low on 05/04/2026 with a history of a serious motorcycle accident, mandibular reconstruction using titanium hardware, and ongoing therapeutic orthodontic treatment. During the initial period of confinement, including my placement in the Special Housing Unit from 05/04/2026 through 05/12/2026, my orthodontic appliance was damaged. Since then, I report losing four teeth, injuries inside my mouth, dental and mandibular bone pain, difficulty chewing and eating, and a retained dental fragment in my gum. The persistence of these symptoms and possibility of additional tooth loss are precisely why I request specialized evaluation.

According to the previously identified records, the 05/15/2026 dental record states "ORTHO TREATMENT IN PROGRESS." The institution obtained or had access to a PANOREX panoramic image, and its professionals stated that the specialized orthodontic care I needed was not available in-house. This has direct administrative significance: when the internal service lacks a specialty, leadership must ensure that the clinical need is evaluated, available consultation and referral mechanisms are considered, and a person in custody is not left indefinitely without a plan as the condition deteriorates.

I do not contend that every complaint of pain automatically constitutes a constitutional emergency. I contend that the reported loss of four teeth, ongoing pain, oral injuries, a damaged appliance, and a reconstructed mandible are concrete information requiring adequate clinical triage, a reasoned explanation, and follow-up. Management cannot treat this information as ordinary correspondence without medical consequences.

---

IV. EXPRESS REQUEST FOR AN EMERGENCY ADMINISTRATIVE REMEDY
In my communications I expressly requested "EMERGENCY ADMINISTRATIVE REMEDY, IMMEDIATE THREAT TO HEALTH AND WELFARE" and stated: "I AM REPORTING AN IMMEDIATE THREAT TO MY HEALTH AND WELFARE AND REQUESTING EMERGENCY PROCESSING UNDER 28 C.F.R. SECTION 542.18". Those words were deliberate. I used them to alert management that I was not seeking merely an ordinary bureaucratic reply, but priority evaluation of an existing health risk in light of injuries and deterioration I continued to experience.
I demand production and identification of the original versions of those requests, their tracking numbers, receipts, dates of entry in the Administrative Remedy Index, any emergency determinations, internal routing, rejection decisions, and responses. I further request identification of the official who declined emergency processing, if that occurred, and the factual and clinical basis for the decision. I reject any treatment of an expressly emergency-designated request as though it vanished from the record merely because it was forwarded to another department or answered generically.
V. THE PRECISE REQUIREMENTS OF 28 C.F.R. § 542.18 AND THEIR APPLICATION
28 C.F.R. § 542.18 distinguishes response deadlines by administrative level. An accepted request or appeal is considered filed on the date it is logged as received in the Administrative Remedy Index. Ordinarily, the Warden or CCM must respond within 20 calendar days, the Regional Director within 30, and General Counsel within 40. The regulation specifically provides that when a request is determined to be an emergency threatening an inmate's immediate health or welfare, the Warden shall respond no later than the third calendar day after filing. It also addresses a single extension, written notification, and the ability to treat a failure to respond as a denial for purposes of further administrative review.
Precision matters: a prisoner's use of the word "emergency" alone does not establish that the request was formally accepted and classified as an emergency. Likewise, failure to respond within three days cannot be conclusively established as a regulatory violation without verifying the filing date and classification. For that very reason, I demand the Index entry, classification history, and reasons for any refusal to recognize the emergency. If accepted and designated as an emergency, the special three-day deadline must be compared with the response date; otherwise, the record must show whether the risk was responsibly evaluated.
A missed deadline does not automatically grant the treatment requested or, standing alone, establish deliberate indifference under the Eighth Amendment. The regulation does, however, permit an unanswered request to be considered denied for further administrative review under the specified conditions. More importantly here, failure to provide a meaningful response despite repeated medical warnings may be relevant evidence of institutional knowledge, opportunity to act, and continuing injury.
VI. DUTY TO PROCESS, INVESTIGATE, AND RESPOND 28 C.F.R. §§ 542.11, 542.13, 542.17, AND 542.18
The Administrative Remedy Program was not established to create an endless cycle of referrals without resolution. The regulations allocate duties for receiving, recording, investigating, and responding at each level. Section 542.13 requires an attempt at informal resolution and requires each Warden to establish procedures for that purpose; § 542.17 governs formal rejections and written notice of reasons; and § 542.18 establishes deadlines and written responses. Any failure must be evaluated by identifying which procedural step occurred and which was omitted.
I request the records of the BP-8, BP-9, BP-10, and BP-11 remedies I submitted, including the BP-9 of 07/20/2026, rejection of 08/17/2026, resubmission of 08/18/2026, response of 09/10/2026 associated with Remedy 1289925-F1, and BP-10 sent on 09/25/2026. Any missing regional or central response must be examined at the responsible level, using the date of logging and the applicable deadline. The Warden is not automatically responsible for every deadline at a higher level, but it is relevant whether local management provided access to forms, forwarded documents, and preserved records.
Responses disconnected from the questions presented, circular referrals, and communications identifying no effective measure must be evaluated on their actual content. A signed and dated paper does not by itself establish that a health need was met. The issue for review is whether management ensured concrete risk assessment and coordinated action, or permitted the condition to continue without a clinically reasoned resolution.
VII. CHRONOLOGY OF REQUESTS DIRECTED TO MANAGEMENT
The communications I assembled during 2026 include dental requests dated 06/02/2026, 07/02/2026, and 07/20 21/2026; responses around 07/06 07/07/2026 concerning the unavailability of orthodontic care at the facility; a 07/30/2026 encounter; a TRULINCS request to Psychology on 08/07/2026; a fourth formal urgent request to the Warden on 08/16/2026; another Dental Sick Call on 08/24/2026; and later messages and COP-OUTs. These dates must be checked against the original copies so that no communication is attributed to the wrong person or to an addressee who did not receive it.
I also requested Reduction in Sentence / Compassionate Release on 08/28/2026, reportedly routed through Captain S. Ximenes, and communicated with the Unit Team, including an 08/31/2026 form and a 09/02/2026 COP-OUT to Case Manager T. Chin. I received the administrative denial of my sentence-reduction request on 10/07/2026; it was signed on 10/06/2026 and bore a 09/23/2026 heading. That procedure has rules distinct from those governing dental grievances, but it is another instance in which management received information concerning my continuing medical condition.
For each request, I demand review of five elements: delivery date; actual recipient; the risk described; the response or absence of one; and the clinical or administrative action actually taken. This method establishes the sequence of institutional notice without turning the number of letters into an automatic presumption of guilt.
VIII. GENERIC RESPONSES DO NOT SUBSTITUTE FOR A CLINICAL RESOLUTION
My central point is objective: despite successive contacts, I continue to affirm that my appliance remains damaged, that I lost

---

teeth, that I have pain and injuries, and that I have received no specialized plan addressing the underlying problem and the risk of additional loss. A consultation, panoramic examination, or cleaning, if performed, does not by itself answer whether the reconstructed mandible was evaluated, the retained fragment investigated, the appliance managed, or specialist care arranged.

---

Management must explain what was decided after Dental Low stated that the required specialty was not offered in-house. If an outside referral was denied, I request the decision, clinical justification, and name of the deciding professional. If pending, I request the date, assigned priority, scheduling steps, and interim protective measures. If the institution believes specialty care is unnecessary, it must provide the specific clinical assessment supporting that conclusion.

IX. STATUTORY DUTY OF CARE AND PROTECTION UNDER 18 U.S.C. § 4042

18 U.S.C. § 4042(a)(2) (3) assigns the Bureau of Prisons duties concerning the care, subsistence, protection, and safekeeping of persons in its custody. I invoke that provision as a statutory measure of institutional responsibility, including management's duty to coordinate health services. I do not claim that this provision alone creates a private damages action against the Warden or excuses the requirements of any particular procedural avenue.

Management controls my access to professionals, outside consultations, records, medication, transportation, and request mechanisms. When I report physical deterioration and risk of further injury, I cannot independently obtain the outside care I believe is necessary. This imbalance is why effective action by those operating the institution is essential. I demand an explanation of how the institution discharged its duty of care in response to a problem not resolved by the procedures performed to date.

X. EIGHTH AMENDMENT: KNOWLEDGE OF RISK AND THE INFERENCE OF DELIBERATE INDIFFERENCE

In Estelle v. Gamble, 429 U.S. 97 (1976), the Supreme Court recognized that deliberate indifference to serious medical needs of prisoners may constitute cruel and unusual punishment prohibited by the Eighth Amendment. In Farmer v. Brennan, 511 U.S. 825 (1994), the Court explained that deliberate-indifference liability involves subjective knowledge of a substantial risk of serious harm and disregard of that risk. These precedents did not decide that FCC Coleman Low or its Warden violated my rights; they supply the legal standard I ask be applied to the proven facts of my case.

I affirm that I repeatedly communicated tooth loss, the damaged appliance, pain, impaired chewing, my history of mandibular reconstruction, and the need for a specialist. I ask that copies of my communications and routing records establish when management actually knew those facts. Continued harm despite knowledge and an opportunity to act is legally relevant; individual liability nevertheless also requires examining each official's authority, conduct or omission, and response to the known risk.

I do not ask the Court to equate an unsatisfactory clinical result automatically with a constitutional violation. I ask that the circumstances be examined without minimizing the facts or treating formal replies as conclusive proof of adequate care. My argument is that, given the extent and persistence of the symptoms, a failure to obtain effective evaluation and action, if confirmed by the records, may support a finding of deliberate indifference.

XI. WARDEN CONDUCT AND THE LIMITS OF LIABILITY BASED SOLELY ON SUPERVISORY STATUS

The office of Warden does not, by itself, create personal liability for every clinical decision made by subordinates. Any potential claim against a particular person requires proof of participation, knowledge, authority to act, and legally relevant conduct. That is precisely why I request identification of communications personally received by or routed to the Warden and Acting Warden, responses issued in their names, directions to Health Services, and supervisory decisions made after urgent warnings.

A lack of knowledge cannot simply be assumed where delivery receipts exist; nor should knowledge be presumed without identifying the communication. The inquiry must reconstruct this connection through documents. If management received a clear warning of immediate risk and forwarded it for assessment, the record must establish whether follow-up occurred, whether the response addressed the emergency, and whether reasonable measures were actually taken.

XII. EMERGENCY REQUESTS CANNOT BE TREATED AS ORDINARY CORRESPONDENCE

I reiterate that I expressly requested emergency processing and reported an immediate threat to health and welfare. Even if management concludes that a request does not satisfy the formal emergency requirements of § 542.18, the clinical risk communicated remains and must be assessed by the appropriate service. An administrative decision not to classify a remedy as an emergency is not itself a medical diagnosis that no risk exists.

I request the triage criteria used, the date the situation was referred to clinicians, the assessment performed, the priority assigned, and the result. If formally rejected, the rejection notice must be produced. If logged as an ordinary request, I ask for the rationale and the deciding official's identity. If classified as an emergency, compliance with the special response deadline must be demonstrated.

XIII. REPEATED CONTACTS, FEAR OF RETALIATION, AND MEANINGFUL ACCESS TO CARE

Beyond management, I sought assistance from Counselor J. Toro, Case Manager T. Chin, Psychology including Mr. B. Kennedy, Trust Funds staff, Food Services, Captain S. Ximenes, Chapel staff including Mr. J. Alba, and Health Services including Mr. J. Lozada. I have previously stated that I delivered printed copies and messages to various officials. Naming those recipients is not an automatic accusation of individual misconduct; it documents the breadth of my attempts to communicate and calls for verification of each delivery and response.

I further report that during recent Call-Out encounters, I experienced treatment I perceived as intimidating by a new Dental Low

---

professional who did not identify herself and allegedly threatened to record that I refused to supply information already contained in my chart. I affirm that this incident increased my fear of returning to the department and undermined my trust in its staff. I request identification of the professional, preservation of encounter notes, and inclusion of my written objection. Disagreement over repetitive questions or a request that staff consult my chart must not automatically become a blanket refusal of treatment.

I request a safe channel for clinical communication and, if necessary, assessment by a different or independent professional as medical resources and criteria permit. My fear of returning to Dental Low must not be construed as surrendering necessary care; at the same time, I recognize that an in-person evaluation may be necessary to determine proper treatment. I demand that it be conducted respectfully, with clear explanations and accurate recording of my position.

XIV. RELATIONSHIP TO AO 250 AND LIMITS OF THE COURT'S AUTHORITY

This memorandum may serve as a factual and legal supplement to my AO 250 motion for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A). Lack of specialized treatment and continued serious deterioration may be relevant under U.S.S.G. § 1B1.13(b)(1)(C), subject to applicable requirements, evidence, and the factors of 18 U.S.C. § 3553(a). The Warden's conduct regarding dental administrative remedies does not replace the separate procedural prerequisite for compassionate release.

The Court presiding over the criminal case does not automatically become the proper forum for every civil, disciplinary, or damages claim arising from prison conditions. Accordingly, the requests below remain within its authority, without prejudice to the use of this history in an appropriate separate administrative or judicial proceeding. Any filing in the criminal case must comply with filing rules, service on the opposing party, and the judge's case-specific orders.

XV. PRESERVATION OF EVIDENCE AND THE NEED FOR AN AUDITABLE DOCUMENTARY TRAIL

I request preservation of all requests identified as emergencies, Administrative Remedy Index records, relevant SENTRY and other system records, receipts, rejections, responses, extension notices, referrals to Health Services, TRULINCS messages, COP-OUTs and BP-A0148 forms, and records of delivery to the Warden and Acting Warden. I also request preservation of clinical records, the original PANOREX, Dental Low notes, specialty-consultation requests, authorization or denial decisions, Call-Out records, and forms concerning purported refusals of care.

Records should be retained in their original form, including metadata, dates, authorship, and modification history where available. Any correction should be a traceable addendum rather than a silent replacement of the original. Unavailable records should be explained in writing, distinguishing documents never created, not located, or destroyed under an applicable retention policy.

XVI. SPECIFIC CORRECTIVE ACTION DEMANDED FROM FCC COLEMAN LOW MANAGEMENT

1. Acknowledge receipt of this notice in writing and identify the official responsible for coordinating the response, without circular referrals that leave the problem unattended.
2. Direct priority clinical assessment of current risk, tooth loss, damaged appliance, gum fragment, pain, and chewing ability, with documented findings and protective measures.
3. Identify the clinical decision concerning the need for an orthodontist, oral and maxillofacial surgeon, or other specialist and, where indicated, document referral, priority, and follow-up.
4. Report the status of each request formally identified as an Emergency Administrative Remedy, including filing date, classification, responsible official, and response.
5. Produce records allowing verification of the deadlines under 28 C.F.R. § 542.18 and any written extension notice.
6. Provide an individualized response to every unresolved clinical issue, without treating a routine cleaning offer as a global answer to the mandibular and orthodontic problem.
7. Identify communications actually received by the Warden and Acting Warden and the measures each official directed.
8. Preserve relevant clinical, administrative, and custody records, including communications and emergency-classification documents.
9. Ensure that exercising rights, filing appeals, and requesting medical records do not lead to retaliation, distorted records, or improper restriction of treatment.
10. Provide a safe and respectful means of medical evaluation, accurately recording any disagreement about a particular procedure without converting it into a general refusal of care.
11. Communicate in writing the measures taken, responsible personnel, pending steps, and reasons for any denial or delay, so that the effectiveness of the response can be verified.

XVII. SPECIFIC REQUESTS TO THE COURT

1. Accept this submission as a supplement to the AO 250 motion if procedurally appropriate, and consider the documented sequence of notices, responses, and medical deterioration.
2. Give prompt consideration to the medical issues presented, in view of continuing symptoms and the alleged absence of specialized resolution.
3. To the extent relevant to the sentence-reduction request, consider the significance of unavailable specialized treatment under 18 U.S.C. § 3582(c)(1)(A) and U.S.S.G. § 1B1.13(b)(1)(C).
4. If necessary and procedurally appropriate, permit supplementation of the medical record or a response from the opposing party concerning relevant clinical and administrative matters.
5. Grant only relief authorized by the Court's jurisdiction and this proceeding, without prejudice to use of the facts in other

---

appropriate proceedings.

XVIII. RESERVATION OF RIGHTS AND NON-WAIVER

Nothing in this document waives requests for care, access to medical records, administrative remedies, protection against retaliation, or legally available judicial relief. Delivering copies to the Warden, Acting Warden, Court, or oversight bodies does not automatically satisfy notice, exhaustion, jurisdictional, limitations, or service requirements applicable to a separate proceeding.

I reiterate that I do not claim automatic victory in an administrative remedy merely because a deadline expired; I demand that the BOP comply with the regulation and document its decisions. Nor do I assign constitutional liability to the Warden merely because of his office. I demand a rigorous investigation of actual knowledge, decisions, and capacity to act in response to repeatedly reported risks.

---

XIX. FINAL DECLARATION AND UNEQUIVOCAL NOTICE

My health and physical integrity cannot be treated as secondary matters. I remain in federal custody, have reported lost teeth and continuing suffering, have used formal and informal channels, have requested emergency measures, and continue to demand effective clinical resolution. I am not seeking a privilege. I demand that responsible officials demonstrate through actions and documents how they are addressing the risk communicated to them.

FCC Coleman Low management must answer a simple and decisive question: after all the warnings received, what concrete clinical plan has been established to prevent further harm? If one exists, I demand that it be identified and implemented. If none exists, I demand immediate assessment of the need and documentation of the appropriate steps. The persistence of my suffering despite repeated requests requires a serious, individualized, and verifiable response.

Respectfully submitted.

Date: 11/07/2026

______________________________

Gilmar Pereira da Silva Junior Defendant Pro Se

BOP Register No. 74744-511 | FCC Coleman Low

DECLARATION UNDER PENALTY OF PERJURY 28 U.S.C. § 1746

I, Gilmar Pereira da Silva Junior, declare under penalty of perjury under the laws of the United States of America that the statements in this document concerning events I personally experienced, symptoms I felt, requests I personally made, documents I personally received or delivered, and communications I witnessed are true and correct to the best of my personal knowledge. When referring to third-party records, institutional decisions, or legal conclusions, I identify them as documents to be verified or matters for the competent authority to decide. Executed on: 11/07/2026, at FCC Coleman Low, Florida.

Signature: ______________________________