---

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA TAMPA DIVISION
UNITED STATES OF AMERICA v. GILMAR PEREIRA DA SILVA JUNIOR
Case No. 8:25-cr-144-KKM-SPF
PRO SE SUPPLEMENTAL MEMORANDUM, FORMAL NOTICE OF CONTINUING MEDICAL HARM, ASSERTED DELIBERATE INDIFFERENCE, AND REQUEST FOR EXPEDITED CONSIDERATION
In support of AO 250 18 U.S.C. § 3582(c)(1)(A) and as independent notice to the responsible officials of FCC Coleman Low and the Federal Bureau of Prisons
Submitted by: Gilmar Pereira da Silva Junior | BOP Register No. 74744-511 | FCC Coleman Low

I. NATURE, PURPOSE, AND SCOPE OF THIS SUBMISSION

I, Gilmar Pereira da Silva Junior, incarcerated at FCC Coleman Low and proceeding pro se, submit this statement to establish a complete, unequivocal, and verifiable record of the persistence and worsening of my dental and mandibular condition, my repeated requests for care and emergency measures, and the continuing absence, as of this submission, of an effective clinical solution capable of stopping the harm I am suffering. This document serves evidentiary and notice purposes: to establish precisely what needs were communicated, to whom, what responses I received, what concrete measures remain outstanding, and why I consider it legally intolerable to maintain a known medical risk without an adequate course of treatment.

This statement supplements the AO 250 previously submitted to the Court. It does not replace that motion, the administrative remedies, communications with oversight bodies, or any separate action seeking treatment or redress. I ask that it be considered with documents actually filed in the case and institutional records. I do not ask that an account become documentary proof merely because it appears here: I affirm the events I personally witnessed and demand examination of records controlled by the BOP. This distinction strengthens, rather than weakens, each authority's responsibility to investigate and respond to the information provided.

II. MY PREEXISTING MEDICAL CONDITION AND THE RESPONSIBILITY ARISING FROM CUSTODY

Before entering federal custody, I suffered a serious motorcycle accident and underwent mandibular reconstruction using titanium material. I was already wearing a therapeutic orthodontic appliance and required continuity of treatment. My condition is not merely an aesthetic concern: it involves a previously reconstructed jaw, implanted fixation material, oral function, and the protection of my remaining teeth. Those facts require a clinically individualized assessment.

I voluntarily reported to FCC Coleman Low on May 4, 2026. From that point forward, I depended on custodial authorities for access to consultations, examinations, records, medication, outside referrals, and treatment. The BOP assumed responsibility for providing or arranging appropriate care. The institution cannot treat the absence of an in-house orthodontist as proof that specialized assessment is unnecessary.

III. INITIAL SEQUENCE OF HARM AND DOCUMENTED KNOWLEDGE OF DENTAL LOW

Approximately two hours after arrival, I was taken to the Special Housing Unit, where I remained until May 12, 2026. During that period, I report that my appliance was damaged around May 6, 2026, and that the first tooth losses began around May 7, 2026. I also report injuries inside my mouth and difficulties caused by the broken appliance. I request preservation of SHU records, including cell and medical-attendance records, to reconstruct the full sequence. These dates identify where the investigation should begin; they do not eliminate the need to review documents and recordings.

On May 15, 2026, Dental Low examined me. The clinical record contains the words "ORTHO TREATMENT IN PROGRESS," establishing that the institution identified ongoing orthodontic treatment. Dr. Gina examined me and, to my personal knowledge, reviewed or had access to a PANOREX panoramic radiograph. I was verbally informed that the institution lacked the necessary specialized orthodontic treatment. The BOP must produce the complete chart, original image, interpretation, clinical plan, and any referral decisions. Acknowledging an internal limitation is not the same as a reasoned clinical finding that outside treatment is unnecessary.

IV. CURRENT HARM: ISOLATED APPOINTMENTS HAVE NOT RESOLVED THE PROBLEM

My orthodontic appliance has remained broken for more than six months. I affirm that I have lost four teeth, still have a fragment of one of those teeth in my gum, suffer cuts and sores in my mouth, tooth pain, deep pain in the bony region of my teeth and jaw, and difficulty chewing and eating. I report persistent bad breath and discomfort associated with this oral condition. These symptoms cannot be evaluated in isolation, because the risk of additional harm must be assessed together with my reconstructed mandible and titanium material.

The teeth already lost cannot be restored by a routine cleaning. A retained fragment, if confirmed by examination, requires a specific decision regarding removal or management. Damaged orthodontic wires or components may cause continuing injuries. Pain in a previously reconstructed mandible requires appropriate assessment rather than a generic response. I demand a documented examination of the remaining teeth, the appliance, oral tissues, chewing function, and whether maxillofacial and orthodontic specialist care is indicated.

---

With every additional day without a documented treatment plan, I continue to experience the symptoms described and remain exposed to the possibility of worsening harm. When I state that my health is continuously deteriorating, I am describing my lived experience of pain, impairment, and lack of an effective solution. I request a qualified medical determination of the causes, severity, prognosis, and urgent measures needed to prevent additional damage.

V. REQUESTS TO DENTAL LOW AND THE DIFFERENCE BETWEEN AN APPOINTMENT, A CLEANING, AND EFFECTIVE TREATMENT

I appeared personally at Dental Low on numerous occasions and submitted Dental Sick Calls, TRULINCS communications, COP-OUTs, and manual BP-A0148 forms. Earlier records include dental communications on July 20 21, 2026, an encounter on July 30, 2026, and another Dental Sick Call on August 24, 2026. The September 10, 2026 administrative response relates to Remedy No. 1289925-F1. This history cannot be reduced to a single visit or an attendance entry. The central question is whether the institution identified and treated the source of my injuries, tooth loss, mandibular pain, and need for specialist evaluation.

I expressly dispute any entry portraying my conduct as a blanket refusal of treatment. I stated in writing that I WAS NOT REFUSING TREATMENT. Disagreeing with an isolated cleaning, declining to sign a form, or asking a professional to review existing records is not an informed refusal of all dental evaluation, pain treatment, imaging, specialist referral, or medically necessary care. I request that any purported refusal be examined in its full context, including what procedure was offered and what I actually said.

The unavailability of an orthodontist inside FCC Coleman Low does not end the obligation to evaluate the need for an outside consultation or another clinically appropriate alternative. The institution must identify who reviewed my condition, what referral options were considered, what decision was made, and what protective care will be provided while the problem remains unresolved. Repeating that the facility cannot provide a particular specialty does not establish that the BOP cannot arrange it.

VI. RECENT CALL-OUTS AND CONDUCT I CONSIDER INTIMIDATING

During approximately the last fifteen days, I have again been summoned to Dental Low through Call-Outs. I appeared and encountered a new team that insisted on requesting information I had repeatedly provided and that, to my knowledge, already appears in my medical records, forms, and communications. I asked the professionals to review my chart and the information already documented instead of treating my condition as though I had never explained it. I did not refuse to cooperate with a legitimate clinical assessment; I insisted that my prior information be considered in full and that the encounter move toward an effective solution.

I report that a new female dentist, who did not identify herself to me, spoke in a tone I considered threatening and treated me improperly. During an encounter occurring on the date of this statement, or on a date to be confirmed from the Call-Out record, she stated that she would record that I had refused to provide the information she requested. I dispute in advance any entry converting my request that she review existing records into a refusal to cooperate or receive treatment. I demand identification of the professional, the time and location of the encounter, the complete clinical entry, any notes made, and preservation of available evidence establishing what occurred.

These events have intensified my fear of returning to Dental Low. I report panic and loss of confidence in the team, even for routine procedures. That fear must not be interpreted as a waiver of my right to medical care. I request evaluation by a professional independent of the personnel involved, a clear and respectful explanation of options, an accurate record of my consent or disagreement with particular procedures, and protection against pressure to sign or make statements that do not reflect my words. A therapeutic relationship affected by fear and distrust requires appropriate communication and evaluation, not simplistic administrative labels.

VII. DIRECT NOTICE TO CUSTODY, HEALTH, AND SUPPORT PERSONNEL

In addition to my requests to Dental Low, I sought assistance from Counselor Mr. J. Toro and Case Manager Mrs. T. Chin. I explained that I had no Unit Manager to whom I could directly bring my needs. I contacted the Psychology Department, specifically Mr. B. Kennedy, as well as Trust Funds and Food Services personnel. I sought assistance from Captain Mr. S. Ximenes and the Chapel, specifically Mr. J. Alba. These communications were necessary because my condition affects not only my teeth but also my ability to eat, my emotional distress, access to services, and the possibility of obtaining coordinated institutional assistance.

I also repeatedly sought assistance from Warden Mr. A. Mendonza and Acting Warden Mrs. C. C. Rhodes, as well as Health Services, specifically Mr. J. Lozada. I affirm that I prepared, printed, and personally delivered documents and copies of communications to these persons and departments. I request preservation of receipts, internal routing records, and each recipient's response. The fact that different departments have distinct duties cannot allow a known medical need to disappear between offices: the responsible authorities must refer the matter to the appropriate team and document what was actually done.

Naming these officials does not, by itself, establish each person's individual liability for a constitutional violation. It documents the channels I used, the notice I affirm I gave, and the need to establish what each person knew and did. I demand an examination of the documents, delivery records, and institutional responses, rather than assumptions that all recipients acted identically.

---

VIII. EXTERNAL COMMUNICATIONS AND CONTINUING EFFORTS TO OBTAIN PROTECTION
According to my mailing records, I sought assistance through letters and documents addressed to oversight and human-rights bodies, including the BOP, Office of Internal Affairs (OIA), Office of Inspector General (OIG), Department of Justice (DOJ), Office of Special Counsel (OSC), professional and accreditation bodies such as BAR and ACA, DOJ Civil Rights Division, Inter-American Commission on Human Rights (IACHR/CIDH), Office of the United Nations High Commissioner for Human Rights (OHCHR), United States Senate, United Nations, White House, and the Brazilian Consulate and Embassy in the United States. I also sought assistance related to compassionate release and forwarded information to Federal Public Defender Mr. Ryan J. Maguire and the U.S. Attorney's Office.
I affirm that I sent supporting documents and detailed communications to several of these recipients. Receipt by each entity must be established through copies of letters, postal receipts, filing confirmations, electronic acknowledgments, or actual responses. I do not presume that every recipient read every document, agreed with my conclusions, or possessed authority to intervene directly. This sequence demonstrates my persistent initiative in seeking help and creating a verifiable record of institutional and external notice.
I also used the BP-8, BP-9, BP-10, and BP-11 administrative remedy mechanisms. My BP-9 was submitted on July 20, 2026, rejected on August 17, 2026, and resubmitted on August 18, 2026. I sent my BP-10 on September 25, 2026, and reported receiving neither a regional response nor notice of an extension. BP-11 is the next stage. I request compilation of the indexes, receipts, and decisions to establish actual dates of receipt and processing. I do not confuse the right to appeal with automatic success on the medical merits.
IX. EIGHTH AMENDMENT: SERIOUS MEDICAL NEED AND DELIBERATE INDIFFERENCE
The Eighth Amendment prohibits cruel and unusual punishments. In Estelle v. Gamble, 429 U.S. 97, 104 06 (1976), the Supreme Court recognized that deliberate indifference to the serious medical needs of incarcerated persons may violate the Constitution, including intentional denial or delay of access to care. That decision also makes clear that medical error, isolated negligence, or mere disagreement over treatment does not automatically amount to an Eighth Amendment violation. My position is not limited to disagreeing with one clinical choice: I describe repeated knowledge of tooth loss, pain, injuries, and impaired chewing followed, I affirm, by the absence of an effective solution and documented specialist plan.
In Farmer v. Brennan, 511 U.S. 825, 837 47 (1994), the Supreme Court explained that deliberate-indifference liability requires examination of the official's subjective awareness of a substantial risk and the response taken. Knowledge may be shown by circumstantial evidence and the obviousness of the risk, but it must not be automatically imputed to every employee. Here, my written requests, examinations, treatment records, personal communications, and repeated reports are concrete evidence I demand be examined to establish who knew what risk, when, and what action was taken.
I affirm that the totality of the facts demonstrates conduct consistent with deliberate indifference and request judicial recognition of a violation when the evidentiary and procedural requirements are satisfied. I do not attribute to the Supreme Court a ruling on my individual case: its precedents establish the legal standard to be applied. The essential point is that the BOP cannot answer a known medical risk merely with bureaucratic entries or repeated appointments without examining whether adequate treatment, referral, and protection against deterioration were provided.
X. STATUTORY DUTY OF THE BOP 18 U.S.C. § 4042
18 U.S.C. § 4042(a)(2) (3) establishes Bureau of Prisons responsibilities concerning the safekeeping, care, protection, and discipline of persons in its custody. I invoke this statute as a basis for the institution's duty to address my known medical needs. I do not contend that the statute automatically creates a separate damages remedy in this proceeding. The Court and competent authorities must examine the specific conduct and applicable avenues of relief.
The continuing suffering I describe, together with repeated notice and the asserted lack of effective specialist referral, requires a concrete institutional explanation: which professionals evaluated my history, what diagnoses or findings were made, what care was offered, what referrals were considered, and what measures are now protecting me from further deterioration. General assurances are no substitute for a traceable clinical plan.
XI. ADMINISTRATIVE REMEDY PROGRAM 28 C.F.R. §§ 542.10 542.19
The BOP Administrative Remedy Program is governed by 28 C.F.R. §§ 542.10 542.19. Section 542.17 regulates formal rejection and notice of reasons; § 542.18 establishes response deadlines and requires written notice of an authorized extension. After an appeal is logged as received in the Administrative Remedy Index, the applicable regulatory response period begins, subject to authorized extensions. If the period expires without a response, the inmate may treat silence as a denial at that level and proceed under the rules. Such silence does not mean that the requested medical relief has automatically been granted.
Section 542.18 also provides that an institutional request determined to be an emergency threatening an inmate's immediate health or welfare must be answered by the Warden by the third calendar day after filing. This rule applies to its particular regulatory circumstances; it does not transform every letter sent to any department into a formally accepted emergency remedy.

---

I request that the institution identify which requests were logged, which were classified as emergencies, who made those determinations, and what responses were issued. Deadline analysis depends on actual filing dates and any written extension notices.
I consider it unacceptable for an agency to demand strict compliance with forms and deadlines from an inmate while failing to document or justify its own actions. I request review of all BP-8, BP-9, BP-10, and BP-11 records, including acceptance, rejection, resubmission, extension, and response records. The administrative process must be assessed according to the regulations actually governing it.
XII. COMPASSIONATE-RELEASE GUIDELINE AND RISK OF SERIOUS DETERIORATION
18 U.S.C. § 3582(c)(1)(A) permits the Court to consider a sentence reduction subject to procedural requirements, the factors of 18 U.S.C. § 3553(a), and the applicable policy statement. U.S.S.G. § 1B1.13(b)(1)(C) addresses a medical condition requiring long-term or specialized care that is not being provided, without which the person is at risk of serious deterioration in health or death. My condition should be examined under that standard: interrupted or compromised therapeutic orthodontic treatment, a reconstructed mandible, loss of four teeth, persistent injuries and pain, impaired chewing, and no effective specialized plan identified in the records available to me.
I submitted my compassionate-release request to the Warden on August 28, 2026, and received the denial on October 7, 2026; it was signed October 6, 2026, with a September 23, 2026 header. The Court should assess the procedural requirements and actual evidence under the applicable statute. My administrative dental grievances and compassionate-release request serve different legal purposes, even though both document the medical circumstances and the authorities notified.
XIII. RECORDKEEPING RESPONSIBILITY AND INACCURACIES IN THE RECORD
I demand preservation of the complete dental chart, the original PANOREX and its interpretation, BP-A0618, Dental Sick Calls, BP-A0148 forms, COP-OUTs, TRULINCS, Call-Outs, attendance records, purported refusal entries, referral documents, outside -consultation decisions, and Administrative Remedy Index records. Any later modification must be traceable and must not erase the original content. If a record cannot be located, the custodian should identify the reason and the search steps undertaken.
I demand review of the accuracy and context of every refusal entry. Refusal to sign, disagreement with an isolated procedure, a request that the professional review existing records, and an informed refusal of a specific proposed treatment are distinct events. They must not be merged into a blanket assertion that I refused all care. I request that my written objections be retained alongside the original entries, with an accurate explanation of the procedure actually offered.
XIV. IMMEDIATE CLINICAL MEASURES AND ACCOUNTABILITY PLAN
I request urgent clinical triage for signs of infection, bleeding, worsening pain, open wounds, difficulty eating, and any other condition requiring immediate intervention. I request a complete dental examination, review of the history of mandibular reconstruction and titanium material, assessment of the safety and stability of the damaged appliance, examination of remaining teeth, investigation of the gum fragment, and assessment of chewing function. Qualified professionals must determine and document the need for oral-and-maxillofacial, orthodontic, or other relevant specialty care.
If specialized treatment is unavailable on site, I request a documented decision concerning outside referral, identifying the responsible professional, clinical criteria, formal referral request, anticipated scheduling process, and interim care. A refusal or delay should be explained on clinical grounds, with a follow-up plan. The institution must address the real medical problem rather than repeatedly refer me to the same unresolved process.
I also request that future appointments be conducted respectfully, without threats or psychological pressure, with identification of the professionals and accurate recording of my statements. In view of my fear and loss of confidence, I request consideration of assessment by a different qualified clinician and a clear explanation of any proposed procedure. My willingness to seek needed care must not be misrepresented as an unconditional acceptance of any particular procedure or as a blanket refusal.
XV. REQUESTS FOR INVESTIGATION, NONRETALIATION, AND PRESERVATION OF RIGHTS
I request a specific investigation of the reported conduct of the unidentified professional who stated that she would record my supposed refusal to provide information. The Call-Outs from the past fifteen days, the assigned personnel, times, notes, and relevant records must be preserved. I request an opportunity to provide my account in writing and obtain copies of releasable records. The investigation should examine the facts without presuming individual guilt or ignoring the potentially intimidating effect on my access to care.
I request protection against retaliation for filing remedies, writing to authorities, requesting treatment, challenging clinical records, and seeking judicial intervention. I do not accept that exercising lawful rights should lead to denial of care, misleading chart entries, intimidation, or unjustified adverse treatment. Any alleged retaliatory action must be examined on its facts and according to the applicable legal standards.
XVI. SPECIFIC RELIEF REQUESTED FROM THE COURT
First, accept this statement as a supplement to the AO 250, if permitted by filing rules and any case-specific orders, and examine the medical circumstances in their complete sequence rather than as isolated events.
Second, give expedited consideration to the pending motion in light of reported tooth loss, pain, functional impairment, and need for specialist assessment, applying 18 U.S.C. § 3582(c)(1)(A), U.S.S.G. § 1B1.13(b)(1)(C), and the applicable sentencing factors.
Third, if necessary and procedurally proper, permit evidentiary supplementation or require an appropriate response concerning the existence of a clinical plan, appointments, referrals, and specialized treatment, within the Court's lawful authority.

---

Fourth, consider the repeated notices and actually documented responses in assessing institutional knowledge, the seriousness of the medical needs, and the risk of deterioration, without presuming that every medical disagreement constitutes deliberate indifference.
Fifth, grant any other relief within the Court's authority in the sentence-reduction proceeding, without prejudice to separate judicial avenues that may be necessary for specific requests for medical care or other remedies.

---

XVII. MEASURES REQUESTED FROM THE WARDEN, HEALTH SERVICES, DENTAL LOW, AND OVERSIGHT BODIES
I demand written confirmation of receipt of this notice from the recipients to whom it is actually delivered; identification of the person coordinating clinical care; urgent assessment; a reasoned decision concerning specialist referral; an interim protection plan; preservation of records; and a substantive written response to each unresolved medical issue. Copies sent to institutional officials must be tracked separately from court filing and service.
Simply repeating that I have already been seen or that the institution has no orthodontist does not answer the central questions: why I lost teeth, how additional loss will be prevented, how the damaged appliance will be treated, what the gum fragment requires, what is causing the persistent pain, and who will provide the needed specialized evaluation. I request concrete answers, with the responsible professionals and steps identified.
XVIII. CONCLUSION AND FINAL NOTICE
I affirm that I sought assistance through every channel available to me and that my condition remains without an effective solution. FCC Coleman Low had repeated opportunities to examine my damaged appliance, tooth loss, mandibular symptoms, and requests for referral. The clinical and administrative records must show exactly what was done; if the authorities maintain that adequate care was provided, they should identify the plan, results, follow-up, and how present risks are being controlled.
I do not accept that the seriousness of this situation can be neutralized by vague formulas, refusal entries taken out of context, or shifting responsibility among departments. I assert my right to seek medically appropriate care, to challenge inaccurate records, to use lawful grievance channels, and to request judicial review. My factual assertions and the institutional records must be examined seriously and in their entirety.
For these reasons, I request immediate, reasoned, and documented action. This instrument formally records my persistent efforts to obtain help, my challenge to entries that distort my requests, and my demand that the responsible authorities address the continuing harm. I reserve all rights and remedies available under applicable law.
DECLARATION UNDER PENALTY OF PERJURY 28 U.S.C. § 1746
I, Gilmar Pereira da Silva Junior, declare under penalty of perjury under the laws of the United States of America that the facts described here as events I personally experienced, symptoms I felt, communications I made, and statements I heard are true and correct to the best of my personal knowledge. References to documents not in my possession, administrative decisions, diagnoses, medical causation, and legal conclusions are identified for examination through the relevant records and competent authorities. Executed at FCC Coleman Low, Florida, on 11 / 07 / 2027
Signature: [redacted]
Gilmar Pereira da Silva Junior BOP Register No. 74744-511